No. 19-0317 – *Blanda v. Martin & Seibert*

WORKMAN, J., dissenting:

**FILED**

**November 22, 2019**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

"The most frequently used exception to at-will employment, a wrongful discharge claim that alleges the termination violated public policy, seeks to balance the employer's interest in operating a business efficiently and profitably, the employee's interest in earning a livelihood, and society's interest in seeing its public policies carried out."[1] In light of the egregious facts pled here, this Court should have taken the opportunity to recognize a public-policy exception to at-will employment when an employee is terminated for reporting her employer's alleged theft of client funds by overbilling for legal services to the proper authorities. West Virginia's criminal statutes reflect myriad expressions of the public policy to encourage the reporting of crimes and correction of activities harmful to our citizenry.[2]

In *Palmateer v. International Harvester Co.*, 421 N.E.2d 876 (Ill. 1981), the Illinois Supreme Court addressed this very issue and expanded its common law to protect

---

[1] Margaret C. Hobday, *Protecting Economic Stability: The Washington Supreme Court Breathes New Life in the Public-Policy Exception to At-Will Employment for Domestic Violence Victims*, 17 Wm. & Mary J. Women & L. 87, 95 (2010) (footnotes and quotation marks omitted).

[2] *See* Syl. Pt. 2, *Birthisel v. Tri-Cities Health Servs. Corp.*, 188 W. Va. 371, 424 S.E.2d 606 (1992) ("To identify the sources of public policy for purposes of determining whether a retaliatory discharge has occurred, we look to established precepts in our constitution, legislative enactments, legislatively approved regulations, and judicial opinions."). "Inherent in the term 'substantial public policy' is the concept that the policy will provide specific guidance to a reasonable person." *Id.* at syl. pt. 3.

1

the whistle-blower. In *Palmateer*, an employee was fired after reporting possible criminal violations by a co-worker to local law enforcement authorities and agreeing to assist in any resulting investigation and trial. Noting the importance of "citizen crime-fighters," the court quite appropriately declared that, "[t]here is no public policy more important or more fundamental than the one favoring the effective protection of the lives and property of citizens." *Id*. at 879.  "The law is feeble indeed if it permits [an employer] to take matters into its own hands by retaliating against its employees who cooperate in enforcing the law." *Id*. at 880.

The majority has expressly sanctioned retaliatory conduct by employers where their employees blow the whistle for theft of client funds by over-billing practices, criminal conduct prohibited by West Virginia Code § 61-3-24 (2014). The majority has squandered an opportunity to protect West Virginia workers from retaliation for reporting criminal wrongdoing in the workplace that affects the public. In view of the majority's answer to the certified question, even if Petitioner were able to prove that every scintilla of her allegations are true—that she uncovered and ultimately reported state and federal criminal conduct and was fired as a result—she and other similarly situated employees are simply without recourse. This runs contrary to our precedent of *Harless v. First National Bank in Fairmont*, 162 W. Va. 116, 125-26, 246 S.E.2d 270, 276 (1978), legal equity, and common sense.

The majority narrowly focuses on the perceived maelstrom of litigation which would ensue if it "threw open the gates" to retaliatory discharge claims which are based on whistle-blowing for common criminal statutes. In this case, Petitioner allegedly uncovered overbilling at the law firm where she worked and ultimately reported this to the FBI. It appears the majority cherry-picks the holding from *Harless*, yet forgets that *Harless* itself involved highly similar allegations: a bank employee suspected his employer of violating certain provisions of the West Virginia Consumer Credit and Protection Act, which acts affected bank customers. The Court found that the Act provides a civil action for the third-party victim and *criminal penalties for certain violations*. Based on the nature of the conduct Mr. Harless purported to blow the whistle on, the Court concluded:

> We have no hesitation in stating that the Legislature intended to establish a clear and unequivocal public policy that consumers of credit covered by the Act were to be given protection. Such manifest public policy should not be frustrated by a holding that an employee of a lending institution covered by the Act, who seeks to ensure that compliance is being made with the Act, can be discharged without being furnished a cause of action for such discharge.

*Id*. at 125-26, 246 S.E.2d at 276 (1978).  How is the conduct Petitioner alleges any different in character?  Like the bank in *Harless*, Martin & Seibert allegedly violated a criminal

3

statute and the Rules of Professional Conduct, and in so doing victimized a third party—the clients.  The majority leaves that question unanswered. [3]

However, our inquiry is not limited simply to whether a particular law or regulation has been violated; rather, our inquiry must focus on whether some "important public policy interest embodied in the law has been furthered by the whistleblowing activity." *Gutierrez v. Sundancer Indian Jewelry,* 868 P.2d 1266, 1273 (N.M. 1993) (citations omitted). The majority's answer to the certified question rests upon the

---

[3] Notably, the employer was a law firm whose members allegedly violated the West Virginia Rules of Professional Conduct—a clear expression of public policy related to policing the conduct of lawyers for the preeminent goal of protecting the public.

While courts generally look to constitutional or legislative pronouncements, some courts have found an expression of significant public policy in professional codes of ethics. *See e.g., Paralegal v. Lawyer,* 783 F.Supp. 230, 232 (E.D.Pa. 1992). The court in *Paralegal* found that the Pennsylvania Rules of Professional Conduct as adopted by the Pennsylvania Supreme Court pursuant to state constitutional powers, Pa. Const. art. 5, § 10(c), could provide the basis for a public policy exception to the at-will employment rule. *See Paralegal,* 783 F.Supp. at 232 (finding public policy against falsifying material facts and evidence from Rules 3.3(a)(1), 3.4(a), and 3.4(b)). In that case, a paralegal whose employer was being investigated by the state bar was terminated after she learned that the attorney-employer had created a false record to exculpate himself and so informed the lawyer who was representing the employer in disciplinary proceedings.

Taking Petitioner's allegations as true, defendants would appear to have violated the West Virginia Rules of Professional Conduct by over-billing and misrepresenting to clients who had performed work for which they were paying. *See* Rule 7.1 W.Va. Rules Prof'l Conduct (prohibiting false or misleading communications about lawyer's services); and 8.4(c) (defining "professional misconduct" to include "dishonesty, fraud, deceit or misrepresentation"). In *Lawyer Disciplinary Bd. v. Hall*, 234 W. Va. 298, 765 S.E.2d 187 (2014), this Court discussed the significant public interests necessarily involved in attorney discipline matters. *Id.* at 309, 765 S.E.2d at 198.

incomprehensible conclusion that our criminal statutes do not express a substantial public policy of the State. While the determination of what constitutes a substantial public policy is often the Achilles heel of a *Harless* claim, we need not struggle to find it here. West Virginia Code § 61-3-24 constitutes the voice of the Legislature and there is a substantial public policy interest embedded in the statute sufficient to support a *Harless* claim.[4]

In its refusal to find a substantial public policy under a *criminal statute*, "absent some prior legislative or judicial expression on the subject," the majority utterly fails to comprehend that the Legislature *has* spoken to public policy considerations when it criminalized the very behavior set forth in West Virginia Code § 61-3-24. "Under the West Virginia Constitution, Article VI, Section 1, and Article V, Section 1—the latter insuring separation of powers among the legislative, the executive and judicial branches of government—enactment of criminal statutes is solely a legislative function." *State v. Grinstead*, 157 W. Va. 1001, 1013, 206 S.E.2d 912, 920 (1974). The Legislature enacted this statute to protect a broad societal interest and the Legislature translated that "public policy into law." *Shell v. Metropolitan Life Ins. Co.*, 183 W. Va. 407, 413, 396 S.E.2d 174, 180 (1990). West Virginia Code § 61-3-24 prohibits criminal activity that is undeniably

---

[4] In discussing this exact statute, this Court has stated that "[t]he obvious purpose of W. Va. Code § § 61-3-24(a) and (b) is to discourage the act of obtaining money, goods, labor, services and other things of value by false pretenses." *State v. Zain*, 207 W. Va. 54, 61, 528 S.E.2d 748, 755 (1999).

5

"injurious to the public or against public good[.]" *Cordle v. Gen.l Hugh Mercer Corp.*, 174

W. Va. 321, 325, 325 SE.2d 111, 114 (1984).  Public policy

> generally captures the communal conscience and common
> sense of our state in matters of public health, safety, morals,
> and general welfare. Another definition includes those matters
> fundamental to citizens' social rights, duties, and
> responsibilities. Once identified, the public policy becomes a
> benchmark in the application of our legal principles.

*Dorshkind v. Oak Park Place of Dubuque II, L.L.C.*, 835 N.W.2d 293, 300 (Iowa 2013)

(quotation marks and citations omitted).

The majority's conclusion reflects a radical departure from the remainder of

the country, many of which have either statutory or common law requirements, along with

limitations on such a cause of action. "There are numerous laws—federal and state, as well

as statutory and common law—that exist to protect the whistleblowing employee." Frank

J. Cavico, *Private Sector Whistleblowing and the Employment-At-Will Doctrine: A

Comparative Legal, Ethical, and Pragmatic Analysis*, 45 S. Tex. L. Rev. 543, 548-49

(2004) (footnotes omitted).

The fact that our Legislature has not seen fit to enact a private sector whistle-

blower statute does not permit this Court to abdicate its responsibility to address this issue

of importance:  whether and under what circumstances retaliation for blowing the whistle

on a violation of a criminal statute is in contravention of a substantial public policy of this

State.[5] *Harless* is, after all, a creation of the common law rather than a legislative fiat. This Court has a responsibility to provide guidance and continue to shape that common law cause of action when faced with matters that are fundamental to citizens' social rights, duties, and responsibilities.

Other states have not permitted legislative inaction to preclude a judicial response for these employees. For instance, in *Wholey v. Sears Roebuck*, 803 A.2d 482 (Md. 2002), the court held that a clear public policy mandate exists in Maryland that protects employees from termination for reporting suspected criminal activities to the appropriate law enforcement authorities. And "[t]o qualify for the public policy exception to at-will employment, the employee must report the suspected criminal activity to the appropriate law enforcement or judicial official, not merely investigate suspected wrong-doing and discuss that investigation with co-employees or supervisors." *Id*. at 496; *see also Miller v. U.S. Foodservice, Inc.*, 405 F. Supp. 2d 607 (D. Md. 2005) (finding that Maryland law protects an employee from retaliatory discharge for employee's cooperation in an ongoing criminal investigation). Similarly, in *Palmer v. Brown,* 752 P.2d 685, 686 (Kan. 1988) the Kansas Supreme Court provided common law whistle-blower protection for an

---

[5] Nor does the absence of the Legislature's broad proclamation of a "public policy" basis for the criminal statute at issue preclude the statute from reflecting precisely that. Our criminal code is simply not worded in such a fashion.  Therefore, rather than idly awaiting a legislative declaration that a criminal statute represents a "substantial public policy" to which the majority could comfortably default, it was incumbent upon it to examine the statute—and our criminal code as a whole—to determine whether it represents such a public policy.  Instead, the majority suggests somehow the Legislature has not spoken to this issue.  The enactment of the statute itself plainly suggests otherwise.

7

employee discharged for reporting to authorities that a co-worker was committing Medicaid fraud by billing for services that had not been performed. The *Palmer* court held that "[i]t has long been recognized as public policy to encourage citizens to report crimes." *Id*. at 689.

Within the last ten years, this Court even foresaw the necessity of clarifying our holding in *Harless* for allegations precisely like those Petitioner presents.  In *Swears v. R.M. Roach & Sons, Inc*., 225 W. Va. 699, 696 S.E.2d 1 (2010), the former employee sought to rely on our criminal laws as the source of public policy. Rejecting his claim, this Court explained that the allegations amounted to nothing more than an alleged violation of a criminal statute that would affect the financial interests of a private corporation; they did not involve a claimed violation of public policy or anything that might be injurious to the public good. This Court noted, however, that

> [w]hile the alleged criminal conduct complained of was not reported to law enforcement officials in the case *sub judice*, if a case arises in which such a report is made to the proper authorities, such a factual scenario could present a question as to whether there is a substantial public policy to protect an employee, of a private employer, who reports suspected criminal conduct to the appropriate governmental authorities and is retaliated against as a result of such reporting.

*Id*. at 705 n.8, 696 S.E.2d at n.8.

In marked contrast to *Swears,* which involved *fiduciary duties owed to a private company*, Petitioner's claim is rooted in allegations of both public policy violations

related to criminal activity and financial harm to some of this state's citizenry. Simply put, Petitioner claims criminal conduct which directly affected third-party client(s) of the firm, not merely the owners or shareholders of the firm.  Thus, the instant case is directly on point with *Harless* as well as *Frohnapfel v. ArcelorMittal USA LLC*, 235 W. Va. 165, 772 S.E.2d 350 (2015).  In *Frohnapfel*, we found an employee who alleged that he was discharged for reporting violations of a permit issued under authority of the West Virginia Water Pollution Control Act, and for making complaint to his employer about those violations, established the predicate substantial public policy required by *Harless*. In *Frohnapfel*, we held: "The mere citation of a statutory provision is not sufficient to state a cause of action for retaliatory discharge without a showing that the discharge violated the public policy that the cited provision clearly mandates." *Id*. at 170-71, 772 S.E.2d at 355-56 (citing *Swears*, 225 W. Va. at 705, 696 S.E.2d at 7). Petitioner has met that burden. Petitioner alleged her employer, a law firm, committed crimes by overbilling clients and those claims clearly trigger substantial public policy concerns.

Moreover, given the inartful wording of the majority's syllabus point five, it is unclear whether its holding is limited to the specific statute at issue—West Virginia Code § 61-3-24—or "suspected criminal conduct" of any type. Under the majority's crimped reading of *Harless*, a prison guard who reported that her co-workers committed crimes by gang-raping an inmate, and then was fired by the jail for making such report, would have no retaliatory discharge claim under the public policy set forth in West Virginia Code §

9

61-8B-3.[6] Such a ruling would be wholly contrary to the public good and contrary to an employee's fundamental social duty and responsibility.  If the majority intended its new syllabus point to apply only to the specific statute at issue, its imprecise wording reference "suspected criminal conduct" certainly suggests retaliation for reporting criminal behavior of any type is now effectively protected conduct for West Virginia employers.

Thus, this Court should have answered the certified question in the affirmative and held: an alleged violation of West Virginia Code § 61-3-24 constitutes a substantial public policy of the State of West Virginia and may support a *Harless* claim when an employee reports the alleged criminal conduct to an appropriate government authority under penalty of perjury. This ruling would recognize the long-established proposition that substantial public policy encourages citizens to report crimes. *See Lachman v. Sperry-Sun Well Surveying Co.,* 457 F.2d 850, 853 (10th Cir. 1972) ("[I]t is public policy . . . everywhere to encourage the disclosure of criminal activity."). Effective implementation of that policy requires the cooperation of citizens possessing knowledge thereof. Employees are the first to learn of activities in the workplace that may have an adverse effect upon the public and are in the best position to bring to a halt that conduct before harm is done.

---

[6] *See* W.Va. Code § 61-8B-3 (providing first degree sexual assault includes, inter alia, sexual intercourse by forcible compulsion with either serious bodily injury or employment of a deadly weapon).

10

The employer's conduct alleged here is repugnant to the public policy of the State of West Virginia and should not be pardoned by this Court. Petitioner's report of suspected criminal activity of her employer to the FBI served the public interest in deterring crime and the interests of innocent persons who stood to suffer specific financial harm. Retaliation by her employer impairs the public interest and the "employer's motivation for the discharge [was allegedly] to contravene some substantial public policy principle." Syl., in part, *Harless*, 162 W. Va. 125, 246 S.E.2d 270.

The majority's failure to expand *Harless* to the facts presented here constitutes neither judicial restraint nor neutrality, but rather an active participation in perpetuating injustice. This is particularly true when the judiciary can craft a narrow exception that protects the interests of responsible, law-abiding employers while holding accountable those whose activities threaten the public interest. Society can never eradicate wrongdoing, but this Court should shield from retaliation those citizens who, urged on by their integrity and social responsibility, speak out to protect the public.

11